SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Anthony D'Agostino and Denise D'Agostino v. Ricardo Maldonado (A-82/83-11) (068940)**

**Argued January 29, 2013 -- Decided October 3, 2013**

**PATTERSON, J., writing for a majority of the Court.**

In this appeal, the Court considers the application of the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20 to a mortgage foreclosure rescue plan.

Beginning in 1993, plaintiffs Anthony and Denise D'Agostino resided in one unit of an inherited, multi-unit property and rented the other units. In 2005, plaintiffs separated, and Anthony D'Agostino lost his job. After accumulating significant debts, including a mortgage on the property, Denise D'Agostino was added as an owner so that she could execute a new $325,000 mortgage. Plaintiffs defaulted on the mortgage in November 2007, at which time they owed $360,000.

Defendant Ricardo Maldonado owned a business purchasing homes from financially distressed owners, negotiating with lenders, and repairing and selling the homes. Maldonado advertised his company using a magnetic sign on his car, showing his phone number and the phrase "I buy houses." Anthony D'Agostino saw the sign and contacted Maldonado in January 2008, at which time the estimated fair market value of plaintiffs' property was $480,000. The parties verbally agreed that plaintiffs would pay Maldonado $40,000, and he would repair the property and bring the mortgage current using rental payments. However, the documents Maldonado prepared and plaintiffs signed created a trust naming Maldonado the sole trustee. For consideration of ten dollars, plaintiffs conveyed their interest to him, although Denise D'Agostino remained personally liable to pay the mortgage balance. An option allowed plaintiffs to recover title by paying Maldonado $400,000 within one year. In March 2008, plaintiffs executed a quitclaim deed transferring full interest in the property to Maldonado. The deed stated that Maldonado paid $360,000 for the interest although he actually paid nothing. Over the following months, Maldonado spent $49,615 of his own money on mortgage payments, outstanding taxes, and repairs. Anthony D'Agostino later offered $40,000 to regain title, and Maldonado declined, informing plaintiffs they could repurchase the property for $400,000.

On March 17, 2009, plaintiffs filed a complaint, alleging a violation of the CFA. The trial court issued a written opinion in which it noted that its decision was complicated by plaintiffs' lack of credibility. Nevertheless, the court found that plaintiffs had sustained their burden with respect to the CFA violation since the parties' transaction was effected by misleading documents giving rise to an "unconscionable commercial practice" under N.J.S.A. 56:8-2. The trial court voided the conveyance to Maldonado and restored title to plaintiffs. It also determined that plaintiffs lost $120,000 in equity on the property. Subtracting $44,653 in improvements paid for by Maldonado, the court arrived at a net damages amount of $75,347. Recognizing that, under the CFA, plaintiffs are entitled to treble damages of $226,041, the court reasoned that the equitable relief of returning the property equated to a third of that damages amount. Thus, the court awarded plaintiffs $150,694, as well as attorneys' fees and costs.

The parties appealed, and the Appellate Division affirmed the trial court's conclusions that Maldonado's conduct was governed by and violated the CFA. However, it reversed the trial court's calculation of damages, explaining that plaintiffs had suffered no ascertainable loss because the trial court had effectively restored them to their position prior to Maldonado's unconscionable conduct. The panel affirmed only the award of counsel fees. The Court granted the parties' cross-petitions for certification. 209 N.J. 232 (2012).

**HELD:** Maldonado's execution of the transactions at issue gave rise to an unconscionable commercial practice under N.J.S.A. 56:8-2. Notwithstanding the trial court's restoration of plaintiffs' equity in their home, the transfer of that equity to Maldonado constituted an ascertainable loss within the meaning of N.J.S.A. 56:8-19, and the trial court's determination of damages was within its discretion.

1

1.  When interpreting statutes, the Court is tasked with determining and applying the Legislature's intent.  This is accomplished, in part, by considering the ordinary meaning of the statutory language in the context of the legislation as a whole.  The CFA is construed in light of its objective to greatly expand consumer protections.  The provisions of the CFA permitting a private cause of action aim to compensate victims for actual losses, punish wrongdoers via treble damages, and provide incentives for competent counsel to take fraud cases involving only minor losses.  Plaintiffs seeking to prove a violation of the CFA must show unlawful conduct, an ascertainable loss, and a causal relationship between the two.  In accordance with N.J.S.A. 56:8-2, an "unconscionable commercial practice . . . in connection with the sale or advertisement of any merchandise or real estate" constitutes unlawful conduct.  N.J.S.A. 56:8-19 provides a statutory remedy to any person who suffers an ascertainable loss of money or property as a result of such conduct.  When a plaintiff  has proven the requisite causal relationship between the conduct and loss, the CFA requires an award of treble damages, as well as attorneys' fees and costs.  (pp. 15-20)

2.  The Court first asks whether Maldonado committed an unconscionable commercial practice within the meaning of N.J.S.A. 56:8-2.  Keeping in mind the deterrent and protective purposes of the CFA, it finds that Maldonado's actions clearly qualify as "commercial practices," and his advertised "services," which he offered to the public for a fee, satisfy the broad statutory definition of a "sale" of "merchandise."  Additionally, the documents memorializing the parties' transaction did not reflect their understanding of the agreement, causing plaintiffs to transfer a $480,000 property to Maldonado for ten dollars.  The credible evidence supports the conclusion that Maldonado's commercial practices were unconscionable.  (pp. 20-26)

3.  As a threshold matter, plaintiffs must also prove an ascertainable loss, which must be capable of calculation and is generally equivalent to any lost benefit of the bargain.  Where a case involves breach of contract or misrepresentation, an out-of-pocket loss or a demonstration of loss in value is sufficient to establish an ascertainable loss.  The damages available under the CFA are intended to make victims whole, while also punishing the wrongdoer and deterring future violations.  When an unconscionable commercial act has caused loss of money or property, that loss can satisfy the threshold "ascertainable loss" element of the CFA claim, as well as constitute "damages sustained" for purposes of the remedy.  (pp. 26-31)

4.  Maldonado's unconscionable commercial practice caused plaintiffs to suffer an ascertainable loss, namely deprivation of the title to their residence.  Although a CFA claim may fail where no loss has occurred prior to litigation, a judicial remedy imposed at the conclusion of litigation does not preclude a finding of ascertainable loss.  Rather, the existence of an ascertainable loss should be determined on the basis of a plaintiff's position following the defendant's unlawful commercial practice.  Thus, the Appellate Division improperly concluded that the trial court's equitable remedy restoring title to plaintiffs precluded a finding of ascertainable loss.  Moreover, rendering plaintiffs ineligible for the mandated treble damages award because they were awarded equitable relief premised upon their ascertainable loss would contravene the goals and objectives of the CFA, which expressly authorizes equitable relief "in addition to" treble damages.  In calculating the remedy, the trial court properly weighed the damages sustained, the impact of the court's equitable remedy, and improvements made to the property at Maldonado's expense.  The resulting damages award is based on competent, credible evidence and is consistent with the CFA's expectation that courts will fashion individualized relief.  (pp. 31-40)

5.  Plaintiffs' claims are not barred by the doctrine of equitable estoppel.  Nothing in the evidence suggests that Maldonado relied on any representation by plaintiffs, and the trial court's opinions regarding the parties' credibility are irrelevant to an equitable estoppel defense.  (pp. 40-42)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART** and the judgment of the trial court is **REINSTATED**.

**JUSTICE HOENS, DISSENTING IN PART** and **CONCURRING IN PART,** joined by **JUDGE CUFF,** expresses the view that, under the plain language of the CFA, a threshold finding of "ascertainable loss" is separate and distinct from a finding of "damages sustained" necessary for application of the statutorily required trebling, and that, although plaintiffs here demonstrated an ascertainable loss, they failed to prove actual damages.

**CHIEF JUSTICE RABNER, JUSTICES LaVECCHIA and ALBIN, and JUDGE RODRÍGUEZ (temporarily assigned) join in JUSTICE PATTERSON's opinion.  JUSTICE HOENS filed a separate opinion dissenting in part and concurring in part, in which JUDGE CUFF (temporarily assigned) joins.**

ANTHONY D'AGOSTINO and DENISE
D'AGOSTINO,

     Plaintiffs-Appellants
     and Cross-Respondents,

        v.

RICARDO MALDONADO,

     Defendant-Respondent
     and Cross-Appellant.


       Argued January 29, 2013 – Decided October 3, 2013

       On certification to the Superior Court,
       Appellate Division.

       Jason L. Bittiger argued the cause for
       appellants and cross-respondents (Bittiger
       Triolo, attorneys).

       Clifford J. Ramundo argued the cause for
       respondent and cross-appellant.

       Margaret Lambe Jurow argued the cause for
       amicus curiae Legal Services of New Jersey
       (Melville D. Miller, Jr., President,
       attorney; Ms. Jurow, Mr. Miller, David G.
       McMillin, and Rebecca Schore, on the brief).

       Madeline L. Houston and Melissa J. Totaro
       submitted a brief on behalf of amicus curiae
       Consumers League of New Jersey (Houston &
       Totaro, attorneys).

       Linda E. Fisher and Kyle L. Rosenkrans
       submitted a brief on behalf of amicus curiae
       Seton Hall University School of Law Center
       for Social Justice.

1

JUSTICE PATTERSON delivered the opinion of the Court.

In this case, the Court applies the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, to a mortgage foreclosure rescue plan.  Plaintiffs Anthony and Denise D'Agostino, in default of their residential mortgage obligations, entered into a series of transactions with defendant Ricardo Maldonado.  As a result of those transactions, defendant obtained title to plaintiffs' home, valued at $480,000, for ten dollars; plaintiffs were given the option to repurchase their home; and plaintiff Denise D'Agostino continued to be obligated to pay the mortgage.

Plaintiffs filed suit against defendant, asserting a cause of action under the CFA along with other claims.  The trial court held that defendant committed an unconscionable commercial practice within the meaning of N.J.S.A. 56:8-2 and that plaintiffs suffered an ascertainable loss.  The court combined treble damages under the CFA with an equitable remedy.  It voided the transaction by which plaintiffs had conveyed their residence to defendant.  The court then calculated damages by determining the equity in the home that plaintiffs lost to defendant, subtracting the value of defendant's improvements to the property, trebling that net amount pursuant to N.J.S.A. 56:8-19, and subtracting the value of the equity returned to

2

plaintiffs from the trebled damages. On the basis of this calculation, the trial court entered judgment in the amount of $150,694, as well as reasonable attorneys' fees and costs, in plaintiffs' favor.

Defendant appealed. The Appellate Division affirmed in part, reversed in part the trial court's determination, and remanded the matter to the trial court. The panel affirmed the trial court's decision that defendant had committed an unconscionable commercial practice contrary to N.J.S.A. 56:8-2. It held, however, that plaintiffs had failed to demonstrate ascertainable loss because the court's equitable remedy had effectively restored to plaintiffs the interest in the property that they had before defendant violated N.J.S.A. 56:8-2. Accordingly, the Appellate Division remanded to the trial court for an amended judgment awarding no damages to plaintiffs. The parties filed cross-petitions for certification in this Court.

We affirm in part and reverse in part the Appellate Division's determination. We concur with the trial court and the Appellate Division that defendant's execution of the transactions at issue gave rise to an unconscionable commercial practice under N.J.S.A. 56:8-2. We reverse, however, the Appellate Division's judgment with respect to the issues of ascertainable loss and the damages sustained. We agree with the trial court that the transfer of plaintiffs' equity in their

3

home to defendant constituted an ascertainable loss for purposes of N.J.S.A. 56:8-19, notwithstanding the trial court's subsequent restoration of that equity to plaintiffs. We also find that the trial court's determination of damages was a proper exercise of its discretion. We further reject defendant's invocation of the principle of equitable estoppel to bar plaintiffs' claim. Accordingly, we reinstate the trial court's judgment in plaintiffs' favor.

I.

In 1993, plaintiff Anthony D'Agostino inherited from his grandmother an unencumbered property in Garfield, New Jersey, designated as Lot 24 and the southern half of Lot 25, Block O, Saddle River Township (the "Property"). There were two buildings on the Property. The Property consisted of several residential units, which Anthony D'Agostino rented out and managed. Plaintiffs resided with their three children in one of the residential units.

In 2005, plaintiffs separated, and Anthony D'Agostino moved from the Property, where his wife and children remained. Later that year, according to Anthony D'Agostino, he lost his job and suffered a series of financial setbacks. In May 2006, in an effort to stabilize his finances, Anthony D'Agostino executed a mortgage on the Property in the amount of $252,000, which he used to stabilize his cash flow and to pay off two previous

4

mortgages, outstanding real estate taxes, overdue utility bills and substantial credit card debt. According to Anthony D'Agostino, by 2007, plaintiffs had accrued a new series of debts, and the Property was cited by local authorities for housing code violations.

Anticipating that his poor credit rating would make it difficult to secure financing, Anthony D'Agostino persuaded Denise D'Agostino to apply for a mortgage in her name alone. Thereafter, according to Anthony D'Agostino's testimony, they executed a quitclaim deed adding her name as an owner of the Property. Denise D'Agostino executed a new mortgage in the amount of $325,000 which may have been used to pay off the previous mortgage. That mortgage, according to trial testimony, was recorded on March 27, 2007. Both plaintiffs secured substantial amounts of cash as a result of that transaction. In the first few months of the term of the mortgage, however, Anthony D'Agostino diverted rental payments to pay his personal expenses. The record does not reveal any mortgage payments made by Denise D'Agostino in 2007.

The mortgagee filed a foreclosure complaint on October 20, 2007, and the court entered a default on November 27, 2007. The amount due on the mortgage was $360,000. It is undisputed that in January 2008, the estimated fair market value of the Property was $480,000.

5

Defendant Ricardo Maldonado, a sales field manager for a major retail chain, maintained a small part-time business purchasing homes from financially distressed homeowners, negotiating with mortgage lenders and other entities with interests in the properties, and repairing the homes and selling them to third parties. At the time of the transaction at issue, defendant's advertising was limited to a magnetic sign on his car that listed his telephone number and stated, "I buy houses." Between 1997 and 2005, defendant conducted transactions involving six homes, earning a substantial profit.

In January 2008, plaintiff Anthony D'Agostino contacted defendant and, according to trial testimony, requested his assistance. Plaintiff Anthony D'Agostino testified that the parties verbally agreed on a relatively simple transaction: plaintiffs would pay defendant $40,000, and defendant would repair the property and use rental payments from tenants to bring the mortgage on the Property current.

The documents prepared by defendant to memorialize their agreement, however, proposed a transaction far more complex than the proposed basic service agreement that had been discussed. Defendant prepared five documents: a Letter of Agreement, an Agreement and Declaration of Trust, a Warranty Deed to Trustee, an Assignment of Beneficial Interest in Trust and an Option Agreement. By the execution of these documents, a trust was

6

created, with defendant named the sole Trustee. For consideration of ten dollars, plaintiffs conveyed their interest in the Property to defendant in his capacity as Trustee. Although plaintiffs were no longer the property owners, the documents provided that defendant had the authority to collect rents, make repairs, pay the mortgage and pay property taxes, and that Denise D'Agostino would be personally liable to pay the mortgage balance. Defendant's documents gave plaintiffs a one-year option to recover title to the Property by paying defendant $400,000. According to the trial court's findings, plaintiffs signed the papers without reading them or consulting an attorney.

Defendant anticipated substantial profit from rental payments. He negotiated a new payment agreement with the lender holding the mortgage. According to defendant's testimony, however, he soon found that the rental payments were insufficient to cover the increased mortgage payments due under the revised agreement, and he realized that he would have to contribute his own funds to pay the mortgage. On March 28, 2008, defendant prepared a quitclaim deed which transferred full interest in the Property to defendant. Plaintiffs then executed the quitclaim deed. Although the quitclaim deed recited that defendant paid $360,000 for this interest, he did not pay any money to plaintiffs in consideration for the transfer.

7

Over the following months, defendant made several mortgage payments, satisfied the outstanding property taxes and made repairs on both residential buildings on the Property. According to defendant, he spent $49,615 of his own money on these services.

Plaintiff Anthony D'Agostino contacted defendant and offered to pay $40,000 -- an amount that plaintiff later admitted at trial that he did not have -- to regain title to the Property. Defendant declined and advised plaintiffs that the Property could only be repurchased for $400,000, as required by the option agreement signed by the parties. Plaintiffs did not pay the money demanded by defendant, and this litigation followed.

## II.

Plaintiffs filed this action on March 17, 2009.[1] They alleged a violation of the CFA, common law fraud, negligent misrepresentation, civil conspiracy and breach of fiduciary duty, and sought declaratory relief quieting title to the Property and invalidating the transfer of title to defendant.

---

[1] In addition to suing defendant, plaintiffs sued a notary public who had notarized some of the documents involved in the parties' transactions, asserting claims for alleged common law fraud, aiding and abetting, civil conspiracy and breach of fiduciary duty. On August 25, 2009, the trial court dismissed the aiding and abetting claim against the notary public on the ground that plaintiffs had failed to prosecute that claim, and later dismissed all remaining claims asserted against the notary public.

8

The trial court conducted an eleven-day bench trial in April and May 2010. Both plaintiffs and defendant testified at length, and the court heard the testimony of five non-party witnesses. The court issued its written opinion on June 30, 2010. It noted that its task was complicated by plaintiffs' lack of credibility as witnesses and held that plaintiffs failed to meet their burden of proof with respect to their claims for common law fraud, negligent misrepresentation and breach of fiduciary duty claims, none of which are before this Court.

The trial court found, however, that plaintiffs had sustained their burden in proving a violation of the CFA. It determined that the parties' transaction was effected by "one-sided and misleading documents" that gave rise to an "unconscionable commercial practice" for purposes of N.J.S.A. 56:8-2. Citing defendant's prior real estate dealings with financially distressed homeowners and his use of a sign to advertise his services, the trial court found that his transactions were within the scope of the CFA, whether or not they were conducted with an intent to defraud.

The trial court then fashioned a remedy. It deemed the conveyance of the Property from plaintiffs to defendant to be void, restoring title to plaintiffs as if no transaction had occurred. The court then assessed plaintiffs' damages. It first determined that plaintiffs lost $120,000 in equity in

9

their home because of defendant's conduct. Next, the trial court subtracted from that figure $44,653, representing the value of improvements (after accounting for rents) made by defendant at his own expense, arriving at a net amount of $75,347.

The trial court next confirmed that plaintiffs were entitled to treble damages and factored its equitable remedy into its damages calculation. The court reasoned that by granting the equitable relief of returning the Property to plaintiffs, it had already provided the plaintiffs with a third of the treble damages to which they were entitled. Accordingly, after trebling the loss that it had calculated -- $75,347 -- the court subtracted $75,347, the value of the equitable remedy, and awarded plaintiffs $150,694 in damages. Pursuant to N.J.S.A. 56:8-19, the court also awarded $50,590 in counsel fees and $1,912 in costs to plaintiffs. The trial court did not expressly address defendant's contention that plaintiffs' claims were barred by the doctrine of equitable estoppel.

Defendant appealed, arguing that the CFA does not govern his transactions. Plaintiffs cross-appealed, contesting the trial court's dismissal of their common-law claims and its calculation of damages. The Appellate Division acknowledged that plaintiffs' claims were not typical real estate-related CFA claims. Nonetheless, it affirmed the trial court's ruling that

10

defendant had sold plaintiffs a "service" included in N.J.S.A. 56:8-1(c)'s definition of "merchandise," and therefore, had sold "merchandise" within the meaning of N.J.S.A. 56:8-2. It further held that defendant was not a casual participant in foreclosure-rescue plans and accordingly concluded that his conduct was governed by the CFA.

With respect to ascertainable loss and the calculation of damages, however, the Appellate Division reversed the trial court's determination. It concluded that because the trial court voided the deed that had conveyed the Property to defendant, it effectively restored plaintiffs to their position prior to defendant's unconscionable practice, and that plaintiffs therefore suffered no ascertainable loss. The Appellate Division affirmed only the trial court's award of counsel fees, which it deemed to be reasonable and a proper exercise of the trial court's discretion. The Appellate Division also rejected defendant's invocation of the doctrine of equitable estoppel.

We granted the parties' cross-petitions for certification. 209 N.J. 232 (2012). We also granted the motions of Consumers League of New Jersey (CLNJ), Legal Services of New Jersey (LSNJ) and Seton Hall University School of Law Center for Social Justice (SHCSJ), for leave to appear as amici curiae.

III.

11

Plaintiffs argue that the Appellate Division properly found the transactions at issue in this case to be within the parameters of the CFA because defendant conducted a "sale" of services. They assert that, consequently, defendant's activity met the statutory definition of "merchandise" set forth in N.J.S.A. 56:8-1(c). Plaintiffs assert that the trial court's and Appellate Division's reliance on defendant's past foreclosure rescue transactions to determine whether he is a "casual seller" exempt from the CFA is irrelevant. Rather, plaintiffs argue that, by virtue of the parties' transaction, defendant is not entitled to such an exemption.

Plaintiffs dispute the findings and calculations of both the trial court and the Appellate Division with respect to ascertainable loss and treble damages. They contend that their ascertainable loss was the value of their equity in the property on the date of the parties' original transaction -- $120,000. Furthermore, they contend that the Appellate Division's conclusion that the voiding of the parties' transaction precluded a finding of ascertainable loss undermines the objectives of the CFA. Citing defendant's failure to seek a set-off in a counterclaim, plaintiffs contest the trial court's setoff of $44,653. Instead, plaintiffs urge the Court to treble the $120,000 equity value of their property, with no reduction for defendant's improvements to the Property, for a damages

12

award of $360,000.  Finally, plaintiffs argue that the trial court and Appellate Division properly rejected defendant's equitable estoppel argument.

Defendant contends that the parties' transaction is outside the parameters of the CFA.  He contests the trial court's and Appellate Division's conclusion that he provided "services" within the meaning of N.J.S.A. 56:8-1(c) because the disputed transaction was tailored to the plaintiffs' individual needs, not offered to the public.  He contends that, consequently, he need not demonstrate that he is a "casual seller" or that he is entitled to any other exemption to the CFA.

Defendant also challenges the trial court's remedy.  He argues that this case is nothing more than a breach of contract case, and the equitable remedy, which he characterizes as rescission and restitution, is inconsistent with an award of damages.  Defendant contends that plaintiffs received the relief that they sought when they filed their lawsuit – characterized as rescission of the contract -- and that they were restored to their pre-transaction condition.  He claims that rescission of the contract and restitution satisfy the punitive and deterrent goals of the CFA.  Accordingly, defendant urges the Court to affirm the Appellate Division's decision regarding the remedy.

Defendant also asserts that plaintiffs should be equitably estopped from asserting a CFA claim, given the trial court's

13

observations about plaintiffs' lack of credibility as trial witnesses and their failure to assert a claim until after defendant had performed his contractual obligations for a year at his own expense.

Amici curiae CLNJ, LSNJ and SHCSJ substantially support the arguments presented by plaintiffs and urge the Court to adopt a flexible remedy for what they assert was a fraudulent and unconscionable transaction. CLNJ contends that because the trial court's equitable remedy was a product of plaintiffs' successful litigation, it does not obviate the need for treble damages under the CFA. LSNJ agrees and argues that plaintiffs are entitled to $360,000 in damages less a credit of $120,000 for the value of plaintiffs' restored equity due to the court-ordered voiding of the transaction. It contends that the Court should deny a set-off reduction for defendant's expenses because defendant perpetrated a consumer fraud. LSNJ also refutes defendant's equitable estoppel argument. SHCSJ contends that ascertainable loss should be calculated on the basis of the plaintiffs' equity at the time of the transaction. It further argues that the treble damages award should be adjusted due to the voiding of the transaction, with the adjustment calculated on the basis of the equity existing on the date that the court granted equitable relief, not on the date of the transaction itself.

14

IV.

We review the trial court's determinations, premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard.

> Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]"
>
> [Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Trust Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)); accord Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84 (1974).]

To the extent that the trial court's decision constitutes a legal determination, we review it de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

As this Court observed with respect to the CFA in Bosland v. Warnock Dodge, Inc., "[o]ur task in statutory interpretation is to determine and effectuate the Legislature's intent." 197 N.J. 543, 553 (2009) (citing D'Annunzio v. Prudential Ins. Co.

15

of Am., 192 N.J. 110, 119 (2007); Daidone v. Buterick Bulkheading, 191 N.J. 557, 565 (2007)).  We review the Legislature's language in light of "related provisions so as to give sense to the legislation as a whole."  DiProspero v. Penn, 183 N.J. 477, 492 (2005).  We read the Legislature's words "in accordance with their ordinary meaning, unless the Legislature has used technical terms, or terms of art, which are construed 'in accordance with those meanings.'"  Bosland, supra, 197 N.J. at 553 (quoting In re Lead Paint Litig., 191 N.J. 405, 430 (2007)) (citing D'Annunzio, supra, 192 N.J. at 119-20).

We construe the CFA in light of its objective "to greatly expand protections for New Jersey consumers."  Id. at 555; accord Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011); Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997).  As this Court has noted, the CFA's original purpose was to "combat 'sharp practices and dealings' that victimized consumers by luring them into purchases through fraudulent or deceptive means."  Cox v. Sears Roebuck & Co., 138 N.J. 2, 16 (1994) (quoting D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 23 (App. Div. 1985)).

In a 1971 amendment to the CFA, the Legislature supplemented the statute's original remedies available to the Attorney General with a private cause of action.  L. 1971, c. 247 (Governor's Press Release).  The CFA's private cause of

16

action is an "efficient mechanism to: (1) compensate the victim for his or her actual loss; (2) punish the wrongdoer through the award of treble damages; and (3) attract competent counsel to counteract the 'community scourge' of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual." Weinberg v. Sprint Corp., 173 N.J. 233, 249 (2002) (quoting Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139 (1999)).

The CFA requires a plaintiff to prove three elements: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." Bosland, supra, 197 N.J. at 557; accord Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc., 192 N.J. 372, 389 (2007). Each of these elements is rooted in the statutory text. N.J.S.A. 56:8-2 describes the conduct that gives rise to an unlawful practice under the CFA:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived

17

> or damaged thereby, is declared to be an unlawful practice[.]

The CFA "specifies the conduct that will amount to an unlawful practice in the disjunctive . . . [and p]roof of any one of those acts or omissions . . . will be sufficient to establish unlawful conduct under the Act."  Cox, supra, 138 N.J. at 19; see also Allen v. V & A Bros., Inc., 208 N.J. 114, 131 (2011). There is no precise formulation for an "unconscionable" act that satisfies the statutory standard for an unlawful practice.  The statute establishes "a broad business ethic" applied "to balance the interests of the consumer public and those of the sellers." Kugler v. Romain, 58 N.J. 522, 543-44 (1971).

The ascertainable loss and causation elements of a CFA claim are set forth in N.J.S.A. 56:8-19, which authorizes a statutory remedy for "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act."  "[T]he plain language of the Act unmistakably makes a claim of ascertainable loss a prerequisite for a private cause of action."  Weinberg, supra, 173 N.J. at 251; accord Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 12 (2004); Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 473 (1988).  An ascertainable loss under the CFA is one that is "quantifiable or measurable," not "hypothetical

18

or illusory." Thiedemann v. Mercedes-Benz USA, L.L.C., 183 N.J. 234, 248 (2005).

When a plaintiff has proven the defendant's unlawful conduct, demonstrated an ascertainable loss and established a causal relationship between the conduct and the ascertainable loss, N.J.S.A. 56:8-19 requires an award of treble damages and provides for other remedies:

> In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.

The treble damages remedy is "mandatory under N.J.S.A. 56:8-19 if a consumer-fraud plaintiff proves both an unlawful practice under the Act and an ascertainable loss." Cox, supra, 138 N.J. at 24. The treble damages and injunctive remedies described in N.J.S.A. 56:8-19 are not mutually exclusive; injunctive relief can be combined with an award of treble damages in an appropriate case. See Weinberg, supra, 173 N.J. at 253 (noting CFA "allows a private cause of action to proceed for all available remedies, including an injunction, whenever" plaintiff asserts a bona fide CFA claim); Laufer v. U.S. Life Ins. Co., 385 N.J. Super. 172, 185 (App. Div. 2006) (concluding "by the express terms of [N.J.S.A. 56:8-19], a private plaintiff who

19

establishes a violation of the Consumer Fraud Act may obtain not only monetary relief, including treble damages and attorneys' fees, but also 'equitable relief'").

Guided by the language of N.J.S.A. 56:8-2, a trial court adjudicating a CFA claim conducts a case-specific analysis of a defendant's conduct and the harm alleged to have resulted from that conduct. See Meshinsky, supra, 110 N.J. at 472 (noting that courts considering alleged CFA violations should "'pour content' into the concept" of unconscionable commercial practices under the CFA "on a case-by-case basis" (quoting Kugler, supra, 58 N.J. at 543)); Papergraphics Int'l, Inc. v. Correa, 389 N.J. Super. 8, 13 (App. Div. 2006) (noting that "CFA applicability hinges on the nature of a transaction, requiring a case by case analysis"); accord Assocs. Home Equity Servs., Inc. v. Troup, 343 N.J. Super. 254, 278 (App. Div. 2001).

In that setting, we consider the two CFA issues raised in this case: the applicability of the CFA to the disputed transaction and the propriety of the trial court's remedy.

V.

We first review the determination of the trial court and Appellate Division that defendant committed an "unconscionable commercial practice . . . in connection with the sale or advertisement of any merchandise" within the meaning of N.J.S.A. 56:8-2. Our statutory interpretation is informed by the

20

"deterrent and protective purposes" of the CFA. Lettenmaier, supra, 162 N.J. at 139. The CFA's drafters "expected the Act to be flexible and adaptable enough to combat newly packaged forms of fraud and to be equal to the latest machinations exploiting the vulnerable and unsophisticated consumer." Gonzalez, supra, 207 N.J. at 582-83.

The CFA's plain language guides us in applying it to this case. The statute defines "sale" to include "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute." N.J.S.A. 56:8-1(e). The term "advertisement" is also broadly defined to mean "the attempt . . . to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan." N.J.S.A. 56:8-1(a).

The Legislature included "services" within the definition of "merchandise," a term that encompasses "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). Although that definition is interpreted "broadly to protect consumers from a wide variety of abhorrent deceptive practices," it has meaningful limits. Lee v. First Union Nat'l Bank, 199 N.J. 251, 258, 261 (2009) (holding that sale of securities is

not within statutory definition of "merchandise"); cf. Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 265 (1997) (concluding CFA term "merchandise" to be "more than sufficiently broad to include" sale and provision of consumer credit); Quigley v. Esquire Deposition Serv., LLC, 400 N.J. Super. 494, 505 (App. Div. 2008) (finding "provision of shorthand reporting services and sale of transcripts of depositions" subject to CFA under expansive definition of "merchandise"). Whether a "service" meets the definition of "merchandise" thus turns on the purpose and nature of that "service."

The complex transaction crafted by defendant here -- combining the conveyance of title to the Property, an agreement for real estate related services, a trust with the authority to manage the property and a buy-back option -- is not exempt from the CFA by virtue of its unique combination of terms. To the contrary, we affirm the trial court's finding that defendant's foreclosure rescue plan is governed by N.J.S.A. 56:8-2, as adequately supported by the evidence. Defendant's actions with respect to plaintiffs and the Property clearly qualify as "commercial practice[s]" for purposes of N.J.S.A. 56:8-2. Because defendant offered "services" for a fee to the public by advertising "I buy houses" on his vehicle and prompting plaintiff Anthony D'Agostino's inquiry about a foreclosure rescue, the trial court properly found that his actions fell

22

within the broad statutory definition of a "sale" of "merchandise."  N.J.S.A. 56:8-1(c), (e).[2]

In short, the trial court and Appellate Division properly concluded that the transaction constitutes a "commercial practice . . . in connection with the sale or advertisement of any merchandise."  N.J.S.A. 56:8-2; see, e.g., Lemelledo, supra, 150 N.J. at 265 (noting CFA "is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers"); Quigley, supra, 400 N.J. Super. at 505 (finding "provision of shorthand reporting services and sale of transcripts of depositions" subject to CFA under its "expansive definition of 'merchandise'"); Assocs. Home Equity Servs., supra, 343 N.J. Super. at 278 (concluding "loans are included in" definitions of "advertisement" and "merchandise" under the CFA).[3]

---

[2] The Foreclosure Rescue Fraud Prevention Act (the Foreclosure Act), N.J.S.A. 46:10B-53 to -68, became effective June 17, 2012, and does not govern this case.  The Foreclosure Act requires, among other provisions, that the obligations and promises of a foreclosure consultant be reduced to writing and that the written agreement contain the "consultant's services to be performed."  N.J.S.A. 46:10B-56(a).  The rights and remedies created by the Foreclosure Act "are not exclusive, but cumulative, and all other remedies or rights provided by State or federal law . . . are specifically preserved.  Nothing in th[e] act shall be construed to limit the application of the consumer fraud act[.]"  N.J.S.A. 46:10B-67(e).

[3] In 1975, the Legislature added the words "real estate" to N.J.S.A. 56:8-2, thus extending the statute's reach to consumer fraud committed "in connection with the sale or advertisement of any merchandise or real estate."  L. 1975, c. 294, § 2.  The

23

The trial court also found that the "commercial practice" at issue was "unconscionable" under N.J.S.A. 56:8-2. An unconscionable practice under the CFA "necessarily entails a lack of good faith, fair dealing, and honesty." Van Holt v. Liberty Mut. Fire Ins. Co., 163 F.3d 161, 168 (3d Cir. 1998); accord Cox, supra, 138 N.J. at 18. Our courts have been careful to constrain the CFA to "fraudulent, deceptive or other similar kind of selling or advertising practices." Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 271 (1978); accord Strawn v. Canuso, 271 N.J. Super. 88, 108 (App. Div. 1994), aff'd, 140 N.J. 43, 49 (1995); see also Real v. Radir Wheels, Inc., 198 N.J. 511, 524, 527 (2009) (concluding defendant "intentionally

_____

CFA, however, does not govern all real estate transactions. "[O]ur courts have adopted a limited construction of the Act's applicability to real estate transactions." 539 Absecon Blvd., L.L.C. v. Shan Enters. Ltd. P'ship, 406 N.J. Super. 242, 274 (App. Div. 2009). Despite limited application of the CFA in the real estate setting, a fraudulent foreclosure rescue plan may, in some circumstances, be governed by the Act. Johnson v. Novastar Mortg., Inc., 698 F. Supp. 2d 463, 464-65 (D.N.J. 2010) (finding cognizable CFA claim where plaintiff alleged two "sale-leaseback transactions in truth created two equitable mortgages" under alleged foreclosure rescue plan); O'Brien v. Cleveland (In re O'Brien), 423 B.R. 477, 483 (Bankr. D.N.J. 2010) (financing scheme involving homeowner's conveyance of home to defendant, with buy-back option, constituted unconscionable commercial practice under CFA), aff'd, No. 10-3169 (D.N.J. Nov. 12, 2010) (slip op. at 1). Given our conclusion that the unlawful conduct at issue here falls within the meaning of "merchandise" in N.J.S.A. 56:8-2, we do not reach the issues of whether the transaction at issue is a sale of "real estate" within the meaning of N.J.S.A. 56:8-2 or whether defendant is exempt from the CFA as a non-professional seller of real estate.

24

had engaged in unconscionable commercial practices in connection with the advertisement and sale of merchandise" by falsely representing condition of car); Assocs. Home Equity Servs., supra, 343 N.J. Super. at 279-80 (concluding reasonable jury could find plaintiff and third-party defendants engaged in unconscionable business practice by imposing unfavorable credit terms on loan).  In contrast, "a simple breach of warranty or breach of contract is not per se unconscionable."  Gennari v. Weichert Co. Realtors, 288 N.J. Super. 504, 533 (App. Div. 1996), aff'd as modified, 148 N.J. 582, 590 (1997).

Here, the trial court, reviewing the extensive record of the bench trial, concluded that the transaction designed by defendant was an "unconscionable" commercial practice.  The trial court noted that defendant admitted that the documents recording the transaction only memorialized the obligations of plaintiffs and did not comport with the parties' understanding of their agreement.  That transaction resulted in plaintiffs' transfer of title to the Property valued at $480,000 to defendant, for ten dollars.

Accordingly, the trial court's ruling that defendant committed an unconscionable commercial practice within the meaning of N.J.S.A. 56:8-2 was adequately supported by competent, relevant and reasonably credible evidence.  We affirm

the Appellate Division's determination with respect to that issue.

                              VI.

This appeal also requires the Court to consider a second issue: whether there was an ascertainable loss and, if so, the remedy to be imposed, when a CFA plaintiff proves that a defendant's violation of N.J.S.A. 56:8-2 resulted in the plaintiff's loss of equity in a residential property.  The Appellate Division held that because the trial court voided the parties' transaction and restored plaintiffs' title to the Property, plaintiffs sustained no ascertainable loss, and therefore were not entitled to relief under the CFA.  We reverse that determination and reinstate the trial court's remedy.

The CFA "requires a private party to have a claim that he or she has suffered an ascertainable loss of money or property in order to bring a cause of action under the Act."  Weinberg, supra, 173 N.J. at 250.  Notwithstanding the importance of ascertainable loss, we find sparse guidance in the statutory text.  Thiedemann, supra, 183 N.J. at 248 (citing Furst, supra, 182 N.J. at 11) ("There is little that illuminates the precise meaning that the Legislature intended in respect of the term 'ascertainable loss' in [the CFA].").  In Thiedemann, this Court described an ascertainable loss as one "that is not hypothetical or illusory[, and] must be presented with some certainty

26

demonstrating that it is capable of calculation[.]" Ibid. Our cases distinguish between a plaintiff who can demonstrate no loss -- be it an out-of-pocket loss or the loss of the value of his or her interest in property -- and a plaintiff who can demonstrate that he or she has been deprived of the "benefit of the bargain" because of a CFA violation. As the Court explained in Bosland:

> We have held that a consumer who had repairs to a vehicle performed under warranty at no cost did not sustain [an ascertainable] loss. [Thiedemann, supra, 183 N.J.] at 251-52. Nor does it exist for a customer who considered, but never purchased, a product and thus suffered no damages because of a fraudulent loan application submitted by the merchant in anticipation of a sale. Meshinsky, supra, 110 N.J. at 475 n.4. On the other hand, we have described our understanding of the ascertainable loss requirement generally in terms that make it equivalent to any lost "benefit of [the] bargain." Furst, supra, 182 N.J. at 12-13 . . . .
>
> [Bosland, supra, 197 N.J. at 558 (alteration in original).]

In Furst, supra, 182 N.J. at 13-14, the Court underscored the nexus between ascertainable loss and the plaintiff's expected benefit of the bargain. There, a carpet bought by the plaintiff from the defendant at a discounted sale price was delivered in a defective condition. Id. at 6-8. The Court determined that the plaintiff's "ascertainable loss" in his CFA action was "the carpet's replacement value." Id. at 7. The

27

plaintiff had paid the sale price of $1,199, but the carpet's regular price was marked at $5,775 -- what the Court deemed to be the "replacement cost." Id. at 7-8, 13. It consulted "well-established remedies available in a typical breach-of-contract case." Id. at 11. The Court noted that an "innocent party has a right to damages 'based on his expectation interest as measured by . . . the loss in the value to him' caused by the breaching party[.]" Id. at 13 (quoting Restatement (Second) of Contracts § 347(a) (1981)). Thus, "a consumer who suffers an ascertainable loss is entitled to the benefit of [his] bargain." Id. at 14. In Furst, that benefit of the bargain was the non-discounted replacement value of the carpet, which the Court trebled pursuant to the CFA. Ibid.

As the Court noted in Thiedemann, "[i]n cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." Thiedemann, supra, 183 N.J. at 248. "Among the equitable and legal remedies available against violators of the [CFA] are treble damages, reasonable attorneys['] fees, and costs of suit"; the purpose of these "is not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others[.]" Furst, supra, 182 N.J. at 12. "[A]n award of treble damages and attorneys' fees is mandatory

28

under N.J.S.A. 56:8-19 if a consumer-fraud plaintiff proves both an unlawful practice under the Act and an ascertainable loss." Cox, supra, 138 N.J. at 24.

Our dissenting colleagues maintain that the trial court, in fashioning its remedy, and the majority in its appellate review of that remedy, confuse the distinct concepts of "ascertainable loss" and "damages sustained" as used in N.J.S.A. 56:8-19, "permitt[ing] one to bleed into the other." Post at ___ (slip op. at 3). The dissent contends that the ascertainable loss sustained by the plaintiff is irrelevant to the calculation of damages under the CFA.

With due respect to our dissenting colleagues, neither the trial court's determination nor our opinion is premised on any misunderstanding of these terms. As N.J.S.A. 56:8-19 makes clear, ascertainable loss plays a distinct role in a CFA claim constituting an element of the statutory cause of action. See Bosland, supra, 197 N.J. at 557; Weinberg, supra, 173 N.J. at 251. Without a "bona fide claim of ascertainable loss that raises a genuine issue of fact," a CFA claim fails. Weinberg, supra, 173 N.J. at 253. There is no calculation of "damages sustained" unless the ascertainable loss requirement is first satisfied. See Thiedemann, supra, 183 N.J. at 247 (citing Weinberg, supra, 173 N.J. at 251, 253). The two concepts indeed have separate functions in the analysis.

"Ascertainable loss" and "damages sustained" are not, as the dissent suggests, unrelated to one another. When an unconscionable commercial practice has caused the plaintiff to lose money or other property, that loss can satisfy both the "ascertainable loss" element of the CFA claim and constitute "damages sustained" for purposes of the remedy imposed under the CFA. The circumstances addressed by the Court in Furst provide an illustration. There, the replacement cost of the defective carpet, which the plaintiff was forced to incur because of the unconscionable commercial practice, constituted an ascertainable loss, thus satisfying the statutory element for a CFA claim. Id. at 11, 13-14. That same replacement cost constituted the measure of "damages sustained," as that term is used in N.J.S.A. 56:8-19, and was trebled under the CFA to calculate the plaintiff's remedy. Id. at 14; see also Lettenmaier, supra, 162 N.J. at 140 (explaining that "[t]he damages are the 'ascertainable loss' (referred to in sentence one [of N.J.S.A. 56:8-19]), which is to be trebled"); Cole v. Laughrey Funeral Home, 376 N.J. Super. 135, 144-45 (App. Div. 2005) (citations omitted) (quotations omitted) (noting that "treble damages under the CFA are limited only to ascertainable loss of moneys or property").

In short, the statute and our case law envision that a plaintiff's loss of money or property may constitute the

requisite "ascertainable loss" -- entitling the plaintiff to collect damages -- and the "damages sustained" for purposes of N.J.S.A. 56:8-19, which are to be trebled.  In a given case, the same quantifiable loss of money or other property, suffered by the plaintiff as a result of the defendant's CFA violation, may serve both purposes in the analysis, consistent with the statute's remedial intent and the requirement of proving damages with certainty.  The dissent's concern that our holding in this regard derives from a misinterpretation of N.J.S.A. 56:8-19 is therefore unfounded.

## VII.

Applied here, the statutory language and principles articulated in our case law support the trial court's determination.  Plaintiffs sustained an "ascertainable loss" as a result of defendant's unconscionable commercial practice -- the transaction that deprived them of title to their residence. That ascertainable loss was determined by the trial court to be plaintiffs' lost equity less a set-off representing the value of defendant's improvements to the Property.

That same lost equity was used by the trial court when it combined two of the non-exclusive remedies authorized by the Legislature -- treble damages and equitable remedies.  It declared the transaction void, thus restoring plaintiffs' equity

31

interest in the Property.[4]  It then calculated damages, factoring in the value of the restored interest by subtracting it from the trebled amount of plaintiff's loss.

Reversing the trial court, the Appellate Division held that the court's equitable remedy precluded a finding of ascertainable loss and spared defendant any liability under the CFA.  We do not concur with that conclusion.  A court adjudicating a CFA claim determines whether the plaintiff has suffered an ascertainable loss, focusing on the plaintiff's economic position resulting from the defendant's consumer fraud -- not his or her circumstances after a judicial remedy has been imposed.  In some circumstances, if the defendant or a non-party takes action to ensure that the plaintiff sustains no out-of-pocket loss or loss of value prior to litigation, then

_____

[4] The trial court ordered that "[t]he conveyance from plaintiffs to defendant of title to the [Property] is hereby void.  Title to the [P]roperty remains with plaintiffs."  Although defendant characterizes this remedy as "rescission," that description is imprecise.  A void contract is "[a] contract that is of no legal effect, so that there is really no contract in existence at all. A contract may be void because it is technically defective, contrary to public policy, or illegal."  Black's Law Dictionary 374 (9th ed. 2009).  A party's election to void a contract is sometimes termed as rescission: either "[a] party's unilateral unmaking of a contract for a legally sufficient reason," or "[a]n agreement by contracting parties to discharge all remaining duties of performance and terminate the contract." Id. at 1420-21; see also Rutgers Cas. Ins. Co. v. LaCroix, 194 N.J. 515, 528 (2008) (explaining rescission remedy for insurance contract misrepresentation).  Neither of these two events occurred here.  The remedy in this case is more accurately termed a declaration that the transaction was void and a restoration of plaintiffs' title.

32

plaintiff's CFA claim may fail. See Thiedemann, supra, 183 N.J. at 251-52 (finding no ascertainable loss when defendant repaired defect in accordance with terms of warranty); Meshinsky, supra, 110 N.J. at 468, 475 (finding no ascertainable loss because defendant repaid bank loan); cf. Real, supra, 198 N.J. at 517-18, 527 (agreeing plaintiff's ascertainable loss was difference between price paid for car and actual value of car delivered); Furst, supra, 182 N.J. at 8-10 (recognizing ascertainable loss as replacement value of defective carpet purchased by plaintiff); Cox, supra, 138 N.J. at 22 (finding plaintiff's ascertainable loss was caused by "Sears' failure to comply with the Home Improvement Practices regulations" resulting in unsafe kitchen).

A judicial remedy imposed at the conclusion of litigation, however, does not preclude a finding of ascertainable loss. In this case, when plaintiffs filed their complaint and later submitted their proofs at trial, they had not recovered their lost equity in the Property. In determining the existence of an ascertainable loss, the trial court properly considered the plaintiffs' position when they came before the Court, not the position to which they would subsequently be restored because of the court's fashioning of an equitable remedy. Indeed, it was only after finding an ascertainable loss that the trial court determined that plaintiffs were entitled to any remedy under

33

N.J.S.A. 56:8-19.  It would contravene the goals of the CFA if a plaintiff, who proves an unlawful practice and ascertainable loss and is awarded equitable relief premised upon that loss, is rendered ineligible for the mandated award of treble damages by virtue of that equitable remedy.  See Weinberg, supra, 173 N.J. at 252-53; Cox, supra, 138 N.J. at 22-24.

Thus, the Appellate Division's holding contravenes the language of the CFA's remedial provision, which provides for treble damages "in addition to any other appropriate legal or equitable relief."  N.J.S.A. 56:8-19.  The rule advanced by the Appellate Division would preclude a trial court from imposing equitable relief as part of a broader statutory remedy, as the CFA contemplates.  See ibid.  Such a rule would also undermine the CFA's legislative purpose of punishing wrongdoers and providing an incentive for attorneys to assert CFA claims.  See Gonzalez, supra, 207 N.J. at 585; Thiedemann, supra, 183 N.J. at 246; Weinberg, supra, 173 N.J. at 248-49.

In its determination of this issue, the Appellate Division primarily relied upon Romano v. Galaxy Toyota, 399 N.J. Super. 470 (App. Div.), certif. denied, 196 N.J. 344 (2008).  In Romano, the defendant sold the plaintiff a used car with its odometer "rolled back" to record mileage substantially below the actual mileage of the vehicle.  Id. at 474-75.  Two years after she bought the car, the plaintiff discovered that the odometer

34

reading was falsified and confronted the defendant, who refused to refund the purchase price.  Ibid.  The plaintiff asserted a claim under the Uniform Commercial Code (UCC), N.J.S.A. 12A:2-608(1), for "the purchase price of the vehicle less a credit for plaintiffs' reasonable use."  Id. at 475, 484.  In addition, the plaintiff asserted a related CFA claim.  Id. at 475.

Although the parties in Romano stipulated to a CFA violation and the jury found an ascertainable loss, the trial court set aside the jury verdict on the CFA claim.  Id. at 475-76.  The trial court found no ascertainable loss and denied the plaintiff's claim for treble damages under the CFA in light of the Romano plaintiff's failure to present evidence that the "roll-back" of the odometer had caused plaintiff to incur any loss of money or value.  The Romano plaintiff, however, elected to seek the remedy of rescission under the UCC, and the trial court granted that remedy on the basis of jury findings relevant to that claim, ordering the plaintiff to return the car in exchange for the purchase price, less the value of the plaintiff's use of the vehicle.  Ibid.  Although the Appellate Division affirmed the trial court's determination, it denied the Romano plaintiff's claim for ascertainable loss on a different basis than that relied upon by the trial court.  Id. at 483-85.  The panel held that the trial court's UCC remedy "restores plaintiff to the economic position she had prior to the

35

purchase, so that she experiences neither loss nor gain as a result of the transaction." Id. at 484. It reasoned that "[o]nce plaintiff [was] restored to her original position, she suffers no loss" and therefore the "plaintiff failed to provide proof of an ascertainable loss." Ibid. Because this case does not involve a plaintiff's election among alternative forms of relief available under different remedial statutes, we need not determine whether the Appellate Division's denial of the plaintiff's ascertainable loss claim in Romano was consonant with the terms and objectives of N.J.S.A. 56:8-19. In this case, only one remedial statute -- the CFA -- is at issue, and the Appellate Division's reliance on Romano here is misplaced.

Our dissenting colleagues opine that plaintiffs could prove no damages because the trial court's equitable remedy rescinded the transaction and returned ownership of the Property to plaintiffs, and that the trial court created "entirely fictional damages" in order to award treble damages. Post at ___ (slip op. at 13-14). To the dissent, the only damages that plaintiffs may have sustained in this case would be incidental damages, such as damages incurred to find alternative housing after they lost title to their residence. Id. at 14.

The dissent's proposed constraints on a trial court's authority to impose a remedy for a CFA violation would contravene the letter and the purpose of the statute. N.J.S.A.

36

56:8-19 expressly authorizes equitable relief "in addition to" an award of "threefold the damages." If imposition of an equitable remedy precluded a CFA plaintiff from an award of treble damages, the Court would effectively rewrite the statutory language to authorize either equitable relief or treble damages, but not both. The Legislature did not provide that if an equitable remedy is a component of the relief granted to the plaintiff, damages must be assessed on the basis of the plaintiff's position after that remedy is imposed. There is nothing in the CFA or our case law that supports such a construction of the statutory language. Moreover, such a rule would contravene the punitive and deterrent objectives of the CFA. See Furst, supra, 182 N.J. at 12; Lettenmaier, supra, 162 N.J. at 139. If a defendant who unlawfully obtains title to real property by virtue of a CFA violation risks nothing more than the voiding of the transaction and the trebling of incidental damages, the statute's punitive and deterrent value would be negligible.

In short, the existence of ascertainable loss resulting from a defendant's CFA violation should be determined on the basis of the plaintiffs' position following the defendant's unlawful commercial practice, not after a judicial remedy has been imposed restoring plaintiffs' property pursuant to the CFA.

37

Accordingly, we reverse the Appellate Division's determination that plaintiffs failed to demonstrate ascertainable loss.

We next consider the trial court's calculation of treble damages under the CFA. When it assessed damages, the trial court was called upon to incorporate three relevant factors: N.J.S.A. 56:8-19's mandate that "damages sustained" by plaintiffs be trebled; the impact of the court's equitable remedy on the parties' positions; and the improvements to the Property that enhanced its value at defendant's expense. The trial court elected to reconcile these factors by subtracting the value of defendant's contribution, deducting a $44,653 set-off from the $120,000 equity loss incurred by plaintiffs due to the parties' transaction. The result of that calculation, $75,347, was held by the trial court to represent plaintiffs' ascertainable loss. The trial court, in accordance with the CFA, found plaintiffs were entitled to treble damages. It subtracted $75,347 from those damages to account for the value of the equity in the Property returned to plaintiffs.

Plaintiffs and amici oppose the trial court's calculation on various grounds. They urge the Court to bar any set-off that has not been sought by a defendant in a counterclaim, to rule that no contribution by defendant after his CFA violation should affect the calculation of damages and to apply a set-off to the defendant's benefit, if at all, only after damages have been

38

trebled.  Plaintiffs and amici offer a range of alternative calculations of damages in this case.

We decline to adopt an inflexible rule that would bar the calculation of treble damages in the manner conducted by the trial court.  The CFA contemplates that courts will fashion individualized relief appropriate to the specific case, combining legal and equitable remedies in some settings. N.J.S.A. 56:8-19; see also Laufer, supra, 385 N.J. Super. at 185 (citing N.J.S.A. 56:8-19 and finding consumer-fraud plaintiff who establishes CFA violation "may obtain not only monetary relief, including treble damages and attorneys' fees, but also 'equitable relief'").  Here, the trial court, fully familiar with the facts and equities of this case following a bench trial, concluded that defendant substantially contributed to the value of the equity in the Property that the court restored to plaintiffs.  In the exercise of the broad equitable authority granted to the trial court, it calculated a set-off reflecting that contribution before conducting the statutory trebling of damages.  See Cuesta v. Classic Wheels, Inc., 358 N.J. Super. 512, 522 (App. Div. 2003) (noting that "general equitable principles apply to permit . . . an offset" of damages to a plaintiff who continued to use a car "after he revoked acceptance" of his leased car).

The issue before the Court is not whether another judge acting as the factfinder could have used a different methodology to calculate damages under the broad guidelines of the law. Instead, the question is whether the trial court's findings in this case are sufficiently grounded in the "competent, relevant and reasonably credible evidence" so as to survive appellate review. See Seidman, supra, 205 N.J. at 169. We answer that question in the affirmative and reverse the Appellate Division's determination on the issue of ascertainable loss and damages.[5]

## VIII.

We affirm the Appellate Division's holding that plaintiffs' claims are not barred by the doctrine of equitable estoppel. Equitable estoppel applies when "'conduct, either express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law.'" McDade v. Siazon, 208 N.J. 463, 480 (2011) (quoting Dambro v. Union Cnty. Park Comm'n, 130 N.J. Super. 450, 457 (Law Div. 1974)). Its elements are "a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment." O'Malley v. Dep't of Energy,

---

[5] The trial court's award of attorneys' fees and court costs to plaintiffs, pursuant to the CFA, N.J.S.A. 56:8-19, unchallenged in this appeal, remains in effect.

109 N.J. 309, 317 (1987).  Equitable estoppel is based on the principles of fairness and justice.  Knorr v. Smeal, 178 N.J. 169, 180 (2003).

Defendant argues that because the trial court found him to be a more trustworthy and helpful witness than plaintiffs at trial and because plaintiffs did not immediately file suit after the transaction at issue, plaintiffs should be equitably estopped from obtaining relief.  He relies in this regard upon the Appellate Division's decision in Joe D'Egidio Landscaping, Inc. v. Apicella, 337 N.J. Super. 252 (App. Div. 2001).  There, the Appellate Division applied equitable estoppel to bar the plaintiff's claim, ruling that the defendant, who asserted a CFA claim, had induced the plaintiff's contractor to commit a CFA violation by convincing the plaintiff not to sign a written contract.  Id. at 255-57.  Although the court noted that the defendant in Joe D'Egidio Landscaping lied under oath, that observation was not the primary reason for the imposition of equitable estoppel.  Id. at 257-59.

Here, nothing in the parties' transaction or communications that led to this litigation suggests defendant's reliance on any representation by plaintiffs.  The trial court's views regarding defendant's credibility, plaintiffs' shortcomings as witnesses, and plaintiffs' delay in filing suit, are irrelevant to an

41

equitable estoppel defense.  The Appellate Division properly

rejected this claim.

VIII.

We affirm in part and reverse in part the judgment of the

Appellate Division, and reinstate the trial court's judgment.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA and ALBIN; and
JUDGE RODRIGUEZ (temporarily assigned) join in JUSTICE
PATTERSON's opinion.  JUSTICE HOENS filed a separate opinion
concurring in part and dissenting in part in which JUDGE CUFF
(temporarily assigned) joins.

ANTHONY D'AGOSTINO and DENISE
D'AGOSTINO,

 Plaintiffs-Appellants
 and Cross-Respondents,

   v.

RICARDO MALDONADO,

 Defendant-Respondent
 and Cross-Appellant.


 JUSTICE HOENS, concurring in part and dissenting in part.

 I concur in the conclusions expressed by my colleagues in their majority opinion, and in the reasoning that supports those conclusions, in all respects except for the majority's analysis and resolution of the dispute about the appropriate remedy.

 More particularly, I agree that the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, applies to this transaction, ante at ___ (slip op. at 20-23). That is to say, I agree that the complicated transaction that defendant created and utilized in his dealings with plaintiffs constituted a "commercial practice . . . in connection with the sale or advertisement of any merchandise[,]" N.J.S.A. 56:8-2; see ante at ___ (slip op. at 22-23), as the Legislature intended that phrase to be construed and as we have interpreted it, see Lemelledo v. Beneficial Mgmt.

1

Corp., 150 N.J. 255, 265 (1997) (concluding that CFA terms are broad enough to include sale of credit and insurance); accord Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 271 (1978).

I agree, therefore, with the majority's conclusion that the transaction, in spite of its "unique combination of terms[,]" ante at ___ (slip op. at 22), did not escape the broad remedial reach of the CFA because it was, at its core, an offer to sell foreclosure rescue services that fell within the definitions of both "sale" and "merchandise[,]" ante at ___ (slip op. at 22-23) (citing N.J.S.A. 56:8-1(c), (e)).

Moreover, I agree that the transaction was an unconscionable commercial practice for the reasons expressed by the majority, see ante at ___ (slip op. at 24-26), which are fully in accord with the statutory language and our case law, see, e.g., Real v. Radir Wheels, Inc., 198 N.J. 511, 524, 527 (2009) (concluding defendant "intentionally had engaged in unconscionable commercial practices in connection with the advertisement and sale of merchandise" by falsely representing condition of car); Strawn v. Canuso, 140 N.J. 43, 60-61 (1995) (describing affirmative acts and omissions that constitute unconscionable actions for CFA purposes).

I dissent, however, because the majority's analysis of the appropriate remedy in this matter is not faithful to the plain language of the CFA. As I see it, the majority, like the trial

2

court, rests its analysis of the appropriate remedy on a fundamentally flawed understanding of the CFA, through which my colleagues have confused the threshold concept of "ascertainable loss[,]" see N.J.S.A. 56:8-19 (authorizing "[a]ny person who suffers any ascertainable loss" to "bring an action" in appropriate court), with the separate concept of "damages sustained," that must be trebled by the terms of the statute, ibid. As a result of that misunderstanding, my colleagues in the majority have embraced the trial court's creation of a fictional loss that served solely as the basis for awarding treble damages in addition to the award of complete equitable relief. Instead, I would apply the plain language of the CFA, leading me to affirm the Appellate Division's well-grounded rejection of the trial court's remedy.

Perhaps because both the terms "ascertainable loss" and "damages sustained" are found in the same provision of the CFA, see ibid., the majority has permitted one to bleed into the other, but there is nothing in the structure of the CFA or in this Court's long history of advancing its purposes that supports that approach. On the contrary, both the traditional plain language approach to statutory construction, and this Court's general understanding of the CFA's purposes as revealed in our relevant precedents, demonstrates the fallacy of the majority's reasoning and its result.

3

I do not intend to suggest that the majority is in error in its numerous citations to decisions of this Court in which the two terms have been used interchangeably, see ante at ___ (slip op. at 29-31), for it plainly has. Nor do I intend to argue that, in many, if not most, cases the two will be identical, because, as the majority points out, they often are. See id. at (slip op. at 31). But this will not always be so, and in no decision before today's has this Court used the term "ascertainable loss" when instead called upon to address squarely what the Legislature meant when it instead used the term "damages sustained[.]" See N.J.S.A. 56:8-19. In my view, the majority's error lies in conflating those two entirely separate and distinct statutory concepts when the context of the dispute demands precision. The Legislature's choice of words makes plain that my colleagues have missed the opportunity to erase the confusion that has crept into our jurisprudence and now will continue to bedevil our courts in what should be a subject of complete clarity. I therefore respectfully dissent.

I.

The principles of statutory construction that guide us in our interpretation of language that the Legislature has chosen to use are so familiar, see, e.g., Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553-54 (2009), that they need not be recited here at length. Rather, it is sufficient to reiterate that when

4

the words chosen are plain, we read them "in accordance with those meanings." In re Lead Paint Litig., 191 N.J. 405, 430 (2007) (citation omitted).

In the case of the particular words that the Legislature has used in the CFA, there is simply no lack of clarity. I begin with the language of the CFA that forms the basis for the remedy and is the focal point of my disagreement with my colleagues in the majority. That section, in its entirety, provides:

> Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.
>
> [N.J.S.A. 56:8-19.]

Stripped to its essence, the provision has three sentences, each of which addresses a separate concept.

The first sentence provides that "[a]ny person who suffers any ascertainable loss [of a specific kind and resulting from a prohibited act] . . . may bring an action[.]" Ibid.

5

The second sentence, which follows that authorization to "bring an action[,]" describes the potential remedy, including trebling, by providing that "the court shall . . . award threefold the damages sustained[.]" Ibid. Significantly, the second sentence recognizes the availability of "other appropriate legal or equitable relief" but ties trebling to "the damages sustained[.]" Ibid. More significant for this appeal, the sentence does not refer back to the concept of "ascertainable loss[.]" Ibid.

The third sentence, which is not germane to this appeal, requires that reasonable attorneys' fees be awarded, regardless of whether the relief that plaintiff achieves is legal or equitable in nature. Ibid.

In short, the language of the statute uses the term "ascertainable loss" only in its description of the right to commence litigation. By linking that phrase to the commencement of litigation, the Legislature made plain its intent that it be merely a threshold. This Court, in the seminal decision construing the meaning and intent of the phrase, addressed it in that context, considering the proofs needed to demonstrate that a particular plaintiff has sufficient evidence to proceed past a dispositive motion. See Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248-49 (2005). After acknowledging that the phrase "ascertainable loss" was not defined in the statute, id.

at 248 (citing <u>Furst v. Einstein Moomjy, Inc.</u>, 182 <u>N.J.</u> 1, 13 (2004)), we looked outside of the CFA for guidance as to the meaning of the phrase, <u>ibid.</u> (citing <u>Webster's Third New International Dictionary</u> 126 (1981)).

Regardless of where it is that we looked for help in understanding the meaning of the phrase, the role it played in the statutory scheme was not in dispute. We explained that it is "the legislative language describing the requisite loss for private standing under the CFA . . . from which a factfinder could find or infer that the plaintiff suffered an actual loss." <u>Ibid.</u>; <u>accord</u> <u>Weinberg v. Sprint Corp.</u>, 173 <u>N.J.</u> 233, 251 (2002) (observing that "the plain language of the Act unmistakably makes a claim of ascertainable loss a prerequisite for a private cause of action"). We observed that the phrase served as the threshold showing of a measureable loss that "will set the stage for establishing the measure of damages." <u>Thiedemann</u>, <u>supra</u>, 183 <u>N.J.</u> at 248 (citing <u>Furst</u>, <u>supra</u>, 182 <u>N.J.</u> at 13). That reading and that interpretation of the phrase is faithful to the plain language of the CFA and it is consistent with the role of ascertainable loss as a threshold showing.

Moreover, that interpretation is faithful to our analysis of the CFA's historical development, because it recognizes that the phrase was added in conjunction with the expansion of the CFA to create a private right of action. <u>Id.</u> at 245-47

7

(reciting history; describing role of ascertainable loss as part of prima facie proofs in private claims). In that context, the threshold of ascertainable loss defines what the CFA requires of private plaintiffs and stands in contrast to the claims that, in accordance with the CFA's original structure, could be brought by the Attorney General. See Bosland, supra, 197 N.J. at 554-55 (reviewing history of CFA and expansion to permit private rights of action); Thiedemann, supra, 183 N.J. at 246 (citing Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 472-73 (1988)).

Ascertainable loss, however, has nothing to do with a CFA plaintiff's eventual recovery. Instead, there are two phrases in the CFA that are relevant to this appeal and that relate to recovery, both of which are found in the second sentence of the provision on which this appeal turns. N.J.S.A. 56:8-19. First, the CFA permits plaintiff to recover "any . . . appropriate legal or equitable relief[.]" Ibid. Second, the CFA refers to "the damages sustained" as being the basis for the required trebling. Ibid.

The phrases "legal . . . relief" and "damages sustained" are not unfamiliar concepts, but are ordinary references to compensatory damages that must be proven with the requisite certainty. See Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 375-76 (2011) (concluding that trial court erred in basing award of damages on "expert's wholly speculative views");

8

Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 48 (1984) (defining compensatory damages as being "designed to compensate a plaintiff for an actual injury or loss"); Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987) (holding that although "[p]roof of damages need not be done with exactitude" damages must be proven "with such certainty as the nature of the case may permit" and may "not be a matter of speculation").

By using the language of ordinary awards of damages in the second sentence of the statutory provision, the Legislature drew a clear distinction between the concept of ascertainable loss that serves as the threshold that a plaintiff must cross in order to file a CFA claim and damages sustained, which is the amount that is subject to trebling.

The former, which is to some extent permitted to be hypothetical, is simply not the same as the latter, which the statute requires to be proven as would any other award of damages. Indeed, we recognized this distinction as part of our explanation of the gatekeeping role that ascertainable loss is designed to play. See Thiedemann, supra, 183 N.J. at 246 (explaining that amendment that created private cause of action "advanced the CFA's purposes by compensating victims for actual losses, punishing wrongdoers through awards of treble damages" and providing for attorneys' fees).

9

I do not suggest that the precedents from this Court or from our Appellate Division uniformly have been careful to draw the distinction between ascertainable loss and damages sustained and therefore to be trebled. Quite the contrary.

Our decisions have utilized the phrase "ascertainable loss[,]" correctly, both to describe or to evaluate the sufficiency of, and to articulate the elements of, a prima facie case. See, e.g., Bosland, supra, 197 N.J. at 557 (describing ascertainable loss as part of prima facie proofs); Weinberg, supra, 173 N.J. at 240 (affirming dismissal on motion for failure to demonstrate ascertainable loss); Meshinsky, supra, 110 N.J. at 475 n.4 (describing ascertainable loss in terms of what "plaintiff might have suffered").

Although less frequently the focus of an appeal, our decisions also have used the phrase "damages sustained" and the phrase actual damages, correctly, to describe the proofs needed for a recovery and for trebling. See, e.g., Weinberg, 173 N.J. at 249 (observing that CFA permits recovery of "losses caused by violations of the Act"); Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139 (1999) (commenting that one of three main purposes of CFA is "to compensate the victim for his or her actual loss"); Daaleman, supra, 77 N.J. at 271 (explaining that CFA "permits a person, who suffers a loss . . . to sue and recover threefold the damages sustained").

10

Nonetheless, there are other decisions in which the phrase "ascertainable loss" was used as a sort of short-hand reference to what, in reality, were actual damages, or was used in a less-than-precise manner in the discussion of general CFA concepts. See, e.g., Furst, supra, 182 N.J. at 14 (describing ascertainable loss in terms of benefit of bargain and replacement value as measure of damages); Cox v. Sears Roebuck & Co., 138 N.J. 2, 23-24 (1994) (applying traditional contract damage principles to identify loss, but commenting that treble damages are awarded when "plaintiff proves . . . an ascertainable loss").

Regardless of whether one can point to language in any of this Court's precedents through which the phrase "ascertainable loss" has been used in place of the more appropriate phrase "damages sustained[,]" this Court has not actually confused the two concepts analytically. Instead, as I see it, the question of what the statute demands as the basis on which there shall be trebling has not been squarely presented prior to this appeal. Indeed, it is the majority's blurring of the two concepts, which the Legislature was careful to separate, in the first case in which the distinction is critical to the analysis, that threatens to inject a level of uncertainty that should be avoided.

11

Nor is there any doubt that the Court today has blurred concepts that the statute regards as distinct. As but one example, the majority observes, correctly, that "if the defendant or a non-party takes action to ensure that the plaintiff sustains no out-of-pocket loss or loss of value prior to litigation, then plaintiff's CFA claim may fail." Ante at ___ (slip op. at 32-33) (citations omitted). But the majority then concludes that "[a] judicial remedy imposed at the conclusion of litigation, however, does not preclude a finding of ascertainable loss." Id. at ___ (slip op. at 33). In making that statement, the majority leaps from "ascertainable loss" the theoretical concept central to the prima facie case, to evaluation of proofs, which the statute defines as "damages sustained" that should be trebled. And it is there that the majority, in my view, has erred.

## II.

In this appeal, the focus is on the remedy to which plaintiffs are entitled, and more particularly, on whether plaintiffs have demonstrated a loss that the CFA requires be trebled.

The trial court first crafted an equitable remedy, essentially rescinding the transaction and returning ownership of the residential property to plaintiffs. See ante at ___ (slip op. at 9). That remedy, however, did not merely restore

12

plaintiffs to the status quo ante.  Instead, it gave them their property, which in the meantime defendant had improved to remedy the outstanding Code violations, and which carried a reduced mortgage due to payments defendant had made.  See id. at ___ (slip op. at 5-8).  In an effort to determine how to calculate a sum so that treble damages could be awarded as well, however, the trial court looked to the concept of ascertainable loss and, essentially, resorted to an analysis that would have been appropriate had the court been deciding a threshold motion.  See id. at ___ (slip op. at 9-10).  Rather than engaging in that task, the trial court should have determined, as the statute requires, what damages plaintiffs had sustained.  Had the trial court done that calculation, there would have been no damages to treble.

That is not because, as the majority suggests, I read the CFA to preclude an award of treble damages once the court has created an equitable remedy, see id. at ___ (slip op. at 36-37), for such an interpretation, as the majority points out, would indeed be "effectively rewrit[ing] the statutory language[,]" see ibid. (slip op. at 37).  Nor is it because the trial court's decision to grant equitable relief created the circumstance in which there were no damages sustained.

Instead, it is simply a reflection of the fact that plaintiffs failed to prove actual damages when they could have

13

done so.  Indeed, plaintiffs almost certainly could have proven damages, because they surely incurred costs in moving from the premises, renting living quarters elsewhere and the like, all of which would have qualified as damages sustained because of defendant's CFA violation.  Had plaintiffs proven those damages, the trial court would have been obliged to treble them, but plaintiffs did not offer such proofs.

Plaintiffs' failure of proofs should not be permitted to support the creation of entirely fictional damages, through the guise of calculating an ascertainable loss, merely for the purpose of awarding treble damages.  That it is fictional is clear from the trial court's calculation itself.  The court designated the equity in the property as the ascertainable loss but then, recognizing that the rescission of the transaction restored to plaintiffs that equity and more, deducted sums invested by defendant to create an amount that the court then doubled rather than trebled.

I do not disagree that the statutory trebling is designed to be punitive; it plainly is.  But in circumstances in which there are no actual damages sustained, and in which plaintiff is restored to a position superior to the one in which he or she began, using a concept like ascertainable loss to create a basis for trebling only results in a windfall.  I see nothing in the statute's language or history and nothing in this Court's

14

precedents that suggests that the CFA's goals of punishment and deterrence require that result.

                                III.

As I read the plain language of the CFA, the concept of ascertainable loss is a threshold showing that plaintiffs must be able to identify to commence litigation and withstand a motion for summary judgment; it is nothing more.  The concept of ascertainable loss is not part of the manner in which the damages sustained are proven and therefore not the basis on which treble damages are calculated.

As I see it, the Appellate Division's analysis in this case, and in similar, published decisions, see Romano v. Galaxy Toyota, 399 N.J. Super. 470, 483-85 (App. Div.), certif. denied, 196 N.J. 344 (2008), is faithful to the plain language of the CFA and fully advance its strong remedial purposes.  Therefore, the Appellate Division's judgment in this matter should be affirmed by this Court.

We have not previously been called upon to address the difference between ascertainable loss and damages that are sustained and therefore are trebled.  By conflating the two separate and distinct concepts, the majority has missed an important opportunity to bring clarity to this statutory remedy.  Instead, the majority's approach invites trial courts to inject speculation into what should be routine calculations of damages

15

and has encouraged them to search out ways to impose treble damages that far exceed the CFA's punitive purpose.

I therefore respectfully dissent.

JUDGE CUFF (temporarily assigned) joins in this opinion.

SUPREME COURT OF NEW JERSEY

NO.    A-82/83                          SEPTEMBER TERM 2011

ON CERTIFICATION TO        Appellate Division, Superior Court

ANTHONY D'AGOSTINO and DENISE
D'AGOSTINO,

       Plaintiffs-Appellants
       and Cross-Respondents,

              v.

RICARDO MALDONADO,

       Defendant-Respondent
       and Cross-Appellant.

DECIDED        October 3, 2013
          Chief Justice Rabner        PRESIDING
OPINION BY        Justice Patterson
CONCURRING/DISSENTING OPINIONS BY        Justice Hoens
DISSENTING OPINION BY

| CHECKLIST | AFFIRM IN PART/ REVERSE IN PART/ REINSTATE | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE HOENS | | X |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | | X |
| TOTALS | 5 | 2 |

1